The ADVERTISING AND POLICY COMMITTEE OF THE AVIS RENT A CAR SYSTEM, the Avis System Advertising Trust, et al., Appellants,

v.

AVIS RENT A CAR SYSTEM, et al, Appellees.

No. B14–88–738–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 10, 1989.

Rehearing Denied Sept. 21, 1989.

John B. Holstead, Houston, for appellants.

J. Rufus Wallingford, Robert S. Harrell, Houston, John M. Simpson, Washington, D.C., Page I. Austin, Carol Vance, Houston, for appellees.

Before MURPHY, ROBERTSON and SEARS, JJ.

## OPINION

ROBERTSON, Justice.

This companion case to our cause number B14–88–00413–CV, decided this day, concerns the resolution of those portions of the underlying suit severed upon the granting of summary judgment on the advertising issue. At the close of evidence the trial court granted an instructed verdict on the remaining declaratory relief sought and submitted questions to the jury on damages and attorney's fees. Based on jury answers, the court rendered a take nothing judgment as to damages from breach of agreements, breach of fiduciary duties or fraud, but rendered judgment that Avis (defendants in the trial court) pay $5,250,-000 in attorney's fees. Both sides have appealed—the A & P Committee and the trust contest the failure of the court to grant the requested declaratory relief and the failure of the jury to find damages while Avis contests its liability for attorney's fees. We affirm the judgment except as to the award of attorney's fees; as to that portion we modify the judgment to delete the attorney's fees award.

The overall dispute arises over the terms of the license agreement (the Exclusive License Agreement, the contract or ELA) between Avis Rent A Car System, Inc. (Avis or licensor) on the one hand and its licensees (licensees), the Advertising and Policy Committee of the Avis Rent a Car System (the A & P Committee) and the Avis System Advertising Trust (the trust) on the other. The broad basis for the litigation is stated in the brief for the committee and the trust:

> Since 1955, this relationship has been governed by the terms of a standard form Exclusive License Agreement (the "ELA"), and by certain other agreements between the parties. The ELA grants the Licensees the right to use the Avis System in their passenger vehicle rental businesses and creates the Advertising and Policy Committee, a joint committee representing Avis and all of the Licensees. Through their elected representatives on this Committee, the Licensees have enjoyed considerable influence and a large measure of control over matters affecting the System as a whole. In July 1981, however, Avis advanced a new "interpretation" of the ELA that greatly limits the Licensees' influence on the affairs of the System, and renounced other long-standing agreements with the Licensees.

At the time the ELA came into existence, an Advertising Trust was created. Large sums of money were generated from fees paid into the trust by both the licensees and Avis, the control of which was in the A & P Committee. When Avis ceased making payments to this fund in 1981, the A & P Committee and the trust filed this litigation contending, among other things, that Avis had breached its agreement, for which the committee sought monetary damages, declaratory relief and attorney's fees. Because the terms of the ELA control, it is essential that certain of its provisions be summarized.

The preamble to the agreement recognizes that Avis is the exclusive owner of, and has the right to use and to license others to use, a plan or system for the business of renting vehicles. The plan or system consists of, among other things, "uniform methods of operation, accounting, advertising service and publicity." One de-

siring to obtain a license to use the system was required to enter into a standard contract, called Exclusive License Agreement, with Avis, which authorized the licensee to conduct a car rental business in a specific geographical area.

In Section 2, the licensee recognized Avis' exclusive right to the system, and all parts thereof, including all advertising matter, and further agreed to conduct the business in accordance with the rules and regulations "as now constituted, or as the same may from time to time be changed or amended by licensor." It was further "agreed that Licensor shall have the right to change the System and change or amend the methods, rules and regulations of said System upon giving notice thereof to licensee."

In Section 3, the licensee agreed to pay a monthly administrative fee for each vehicle on its monthly report. Section 4 provided for a "National Advertising Program." Each licensee agreed "to subscribe to the National Advertising Campaign which the Licensor and licensees may carry out and to contribute to the expense thereof." The advertising fees which the licensee agreed to pay was a set amount for each vehicle contained in the monthly report. Avis was to collect the funds and account for them "as the Advertising and Policy Committee ... shall direct." Section 4.3 provided that the expenditure of "these advertising funds shall be the complete responsibility of said Advertising and Policy Committee and shall be carried out only in such manner as shall be approved by said Committee." The section authorized the A & P Committee to appoint trustees to manage such funds. In Section 4.4, Avis expressly reserved the right to stipulate the manner in which the name of Avis or the system was to be used in any advertising and "to disapprove any advertising in which such names may be used."

Section 5 created the Advertising and Policy Committee. It was to be a 13 member joint committee representing Avis and the licensees—six members to be appointed by Avis and seven members elected by the system licensees. Section 5.2 charged the

committee with "full responsibility for the Avis System National Advertising program as set forth in Section 4, above." The committee was to serve "as a general policy committee for the Avis System" and Avis "agree[d] to call meetings of the Committee at least two times per year to consult with Licensor concerning System Policy." The section further required the meetings and decisions of the committee to be reported to the licensees after each meeting. Section 5.3 required a quarterly financial report concerning the advertising funds to be filed with the committee and an annual certified financial report and its review by a committee of licensees.

Through Section 6, licensor convenanted, among other things "[T]o make available to Licensee the privilege of consulting with the appropriate personnel of Licensor upon the problems of advertising, promoting, operating, and developing the Licensee's rent-a-car business."

In Section 8, Avis expressly reserved the right to change "when and as it chooses," the system or any part thereof, including procedures and standard rental agreements.

Section 11 wholly integrates the agreement by providing that "[T]his Agreement supercedes all prior agreements whether written or oral between the parties hereto and contains the entire agreement of the parties and no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect."

At the conclusion of the evidence the trial court instructed a verdict on the plea for declaratory relief concerning the construction of the ELA, ruling as a matter of law:

1. The Advertising and Policy Committee has the exclusive right and responsibility to conduct the Avis System National Advertising Program subject to Avis' right to stipulate the manner in which the name "Avis" or the name of the System may be used in any such advertising and disapprove any advertising in which such names may be used, all as set out in the Declaratory Judgment and In-

junction Enforcing Same signed by the Court on December 1, 1987, at 4:30 p.m.[1]

2. The Advertising and Policy Committee serves as a general policy committee for the Avis System to give advice and to be available to Avis for consultation, but its decisions are not binding on Avis, except in matters involving the Avis System National Advertising Program.

3. Avis is not required to pay to the Trust any fees and/or Support Funds (except the Licensees' Advertising Fee which Avis collects, safeguards and accounts for as the Advertising and Policy Committee shall direct).

4. Avis is not prohibited from issuing a form of license agreement different from the 1955 standard form Exclusive License Agreement, as amended. In the event that Avis issues a license agreement for a fixed term, or an agreement terminable without cause at any time, excluding, however, those agreements terminable without cause within the five-year period after the inception of such agreement, the licensee issued such an agreement shall not have the right to:

   a. approve or disapprove changes in, or otherwise affect, the terms or provisions of the standard form Exclusive License Agreement, as amended, granted to any holder thereof, or

   b. vote for the election of a licensee member or alternate licensee member or be eligible for election as a licensee member or alternate licensee member of The Advertising and Policy Committee described in the Exclusive License Agreement.

5. Avis has no right to assess and/or allocate costs for the sales force, reservation center, advertising and/or other activities.

6. The Court finds that the Intercity Rules and regulations of the Avis System for the contiguous forty-eight (48) states of the United States shall not be changed, amended or modified without a prior written agreement between Avis and the Licensees' representatives on the Advertising and Policy Committee.

The remaining issues were submitted to the jury through twenty-one questions and will be referred to as necessary in discussion of the issues before us.

    ■ In their first through fourth points of error, appellants contend the trial court erred in granting Avis' motion for instructed verdict and rendering a declaratory judgment that the A & P Committee serves as a general policy committee for the Avis System to be available for consultation but that its decisions are not binding on Avis except in matters involving the Avis System National Advertising Program. Appellants conclude that Section 5 of the ELA "clearly gives the Committee the right and responsibility to decide System policy affecting all members of the System." To reach this conclusion appellants argue the general scheme of the ELA, the particular language of Section 5 and the circumstances surrounding the inception of the ELA show that Avis and the licensees intended the committee's policy decisions to be binding on all system members. We disagree.

    ■ First, the provisions of the ELA simply do not provide that Avis is bound by the decisions of the A & P Committee. It is a cardinal rule of construction as applied to all contracts that the court must ascertain the intention of the parties as expressed in the language used in the instrument itself. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). To achieve this objective, courts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless. *Id.* at 393. Not only does the ELA not expressly provide for the binding effect of A & P Committee decisions, but to construe Section 5 in accordance with appellant's interpretation would render ineffective other provisions of the ELA that unquestionably recognize Avis' ownership of, and right to control and change, the Avis system.

---

1. This declaration was originally rendered by the trial court on partial summary judgment— our cause number B14–88–00413–CV, this day decided—and repeated in its final judgment.

Second, the testimony presented by appellants, over Avis' objection, that when the ELA was adopted in 1955, "Avis and the Licensees intended that the Advertising and Policy Committee was to be responsible for deciding System policy," cannot be used to vary the terms of the ELA. While we readily agree that evidence of surrounding circumstances is material, it is material only *as an aid in the construction of the contract's language.* The rule is succinctly stated in *Sun Oil v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981):

> Evidence of surrounding circumstances may be consulted. If, in the light of surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing. Consideration of the facts and circumstances surrounding the execution of a contract, however, is simply an aid in the construction of the contract's language. There are limits. For example, when interpreting an integrated writing, the parol evidence rule circumscribes the use of extrinsic evidence.

When parties have concluded a valid integrated agreement with respect to a particular subject matter, the parol evidence rule precludes the enforcement of inconsistent prior or contemporaneous agreements. *Sun Oil,* 626 S.W.2d at 731; *Hubacek v. Ennis State Bank,* 159 Tex. 166, 317 S.W.2d 30, 32 (1958). As pointed out by Avis, such evidence was clearly subject to the parol evidence rule because it contradicted the final expression of the parties in the ELA. Section 11 of the ELA renders the ELA an integrated contract. That section provides that the agreement "supersedes all prior agreements whether written or oral between the parties hereto," that the agreement "contains the entire agreement of the parties," and that "no representations, inducements, promises or agreements, oral or otherwise" shall be of any force or effect. The parol evidence rule is "particularly applicable" to such a contract. *Weinacht v. Phillips Coal Co.,* 673 S.W.2d 677, 679 (Tex.App.—Dallas 1984, no writ).

Absent pleading and proof of fraud, accident or mistake in the execution of the agreement, an integrated contract presumes that all prior agreements of the parties relating to the transaction have been merged into the written instrument. *Wilkins v. Bain,* 615 S.W.2d 314, 315 (Tex. Civ.App.—Dallas 1981, no writ). Appellants have not asserted that the ELA was executed, or that Section 11 was included, because of fraud, accident or mistake. Quite the contrary, the evidence shows that the ELA was the result of some ten months of "give and take" drafting work by three Avis officials and four licensees, all of whom sought and received legal advice from their respective counsel.

Finally, and in the alternative under this collection of points, appellants contend the ELA is ambiguous and that parol evidence was therefore admissible to show the intention of the parties that the policy decisions of the A & P Committee were binding on Avis. A writing is ambiguous, and parol evidence admissible, only when the face of the agreement leaves it uncertain which of two or more meanings is the proper one. *Gibson v. Bentley,* 605 S.W.2d 337, 339 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.). There simply is no language in Section 5 which renders it subject to more than one reasonable interpretation. The agreement therefore, cannot be ambiguous. Appellant's first four points of error are overruled.

In points of error five through ten, which appellants group for discussion, they contend that Avis was obligated to pay fees and support funds on the same basis as the licensees. For several years Avis voluntarily contributed fees and support funds to the Advertising Trust. The contributions made by Avis were calculated in the same manner as the contributions made by the licensees. When Avis stopped making payments to the trust, the licensees filed this lawsuit alleging that, while the ELA did not provide for payments to be made by Avis, Avis induced the licensees to accept the ELA by promising it would make contributions to the trust. As above stated, at the conclusion of the evidence the trial court ruled as a matter of law that, under

the terms of the ELA, Avis was not required to pay to the trust any fees and/or support funds. Appellants do not assign error to the instructed verdict by the court on the terms of the ELA. Instead they base their argument on answers by the jury to the first question. Even though the instructed verdict had been granted, the trial court submitted the following questions to the jury, which the jury answered, as shown:

## QUESTION NO. 1

Do you find that Avis, as reflected in its conduct, course of action, or the minutes and records of Committee and/or Convention meetings and/or other printed records, agreed with the Licensees to:

a. Pay fees into the Trust on the same basis as the Licensee;

b. Pay into the Trust the support funds it received;

c. Not to issue any other exclusive franchise agreement other than the 1955 form.

Answer "Yes" or "No"

ANSWER

a. Pay fees into the Trust on the same basis as the Licensees?

 Answer: <u>YES</u>

b. Pay into the Trust the support funds it received?

 Answer: <u>YES</u>

c. Not to issue any other exclusive franchise agreement other than the 1955 form?

 Answer: <u>NO</u>

If you have answered Question No. 1 "Yes" as to a, or b, then answer the following:

## QUESTION NO. 2

Do you find that Avis failed to:

a. Pay into the Trust the fees that you have so determined?

Answer "Yes" or "No" ANSWER: <u>NO</u>

b. Failed to pay into the Trust the support funds it received?

Answer "Yes" or "No" ANSWER: <u>NO</u>

## QUESTION NO. 3

Other than any agreements expressed or implied in the Exclusive License Agreement, do you find that (1) Avis made the following promises, if any, (2) with reasonable expectation that its promises, if any, would induce action or forbearance on the part of the party receiving the promise, and (3) that the party receiving the promise acted in reasonable reliance to his detriment?

a. Avis would make payments to the Trust on the same basis as the Licensees?

Answer "Yes" or "No" ANSWER: <u>NO</u>

b. Avis would pay into the Trust domestic support funds it collected?

Answer "Yes" or "No" ANSWER: <u>NO</u>

c. Avis would not issue a form of Exclusive License Agreement other than the exclusive license agreement so long as the Exclusive License Agreements are in effect?

Answer "Yes" or "No" ANSWER: <u>NO</u>

These questions inquired whether Avis, *outside of the provisions of the ELA,* had agreed to pay the fees contended. Based on these answers, appellants requested the court to declare in its final judgment that Avis was obligated to make fee and support payments on the same basis as the licensees. The trial court disregarded the answers of the jury and held to the instructed verdict he had previously granted.

Appellants argue the answers to questions 1(a) and 1(b) constituted a jury finding of an implied contract and therefore entitled them to a declaratory judgment that Avis was obligated to make the fee and trust payments the same as the licensees. Appellants do not cite any authority to support their contention that they are entitled to rely on the express written contract on the one hand while at the same time contend there was an implied contract at variance with and providing terms in addition to those contained in the written

contract. While appellants do not use the term "promissory estoppel" in their argument, they are indeed arguing that Avis is estopped, by its prior action, from refusing to make trust payments. First, in answer to question three, the jury failed to find the elements of promissory estoppel and appellants do not complain of the answers to that question. Second, estoppel is a *defensive theory* and does not create a contract right where one does not otherwise exist. *Sun Oil v. Madeley*, 626 S.W.2d at 734. This was merely another attempt to vary the terms of the integrated contract by parol evidence, which is prohibited. The trial judge was in error in submitting the questions, but he was correct in disregarding them. Appellants' points five through ten are overruled.

■ In their eleventh point of error appellants contend the licensees are not obligated to pay advertising fees if Avis is not obligated to make payments to the trust. The basis for this point is that, because the jury found in answer to question 1(a) that Avis agreed to pay fees into the trust on the same basis as the licensees, it naturally follows that the licensees agreed to pay the advertising fees stated in the ELA on the same basis as Avis. Therefore, appellants conclude, if Avis is not obligated to make payments to the trust on the same basis as the licensees, the licensees are legally excused from paying the advertising fee. They base this conclusion on the legal principle that a party is excused from the performance of a covenant if a mutually dependent covenant is breached by the other contracting party, citing *Greenstein v. Simpson*, 660 S.W.2d 155 (Tex.App.—Waco 1983, writ ref'd n.r.e.) and other cases.

We reject appellants' point for several reasons. First, the ELA simply does not contain any covenant that obligates Avis to pay funds to the trust. There could not, therefore, be a "mutually dependent covenant." Second, the trial court rendered an instructed verdict that Avis is not required to pay funds into the trust and appellants do not appeal this issue. Further, the jury, in answer to the second question, failed to find that Avis had failed to pay fees to the

trust. And, finally, appellants' promise to pay advertising fees is expressly included in the integrated contract. Appellants' eleventh point is overruled.

In points of error twelve through sixteen, which appellants group for discussion, they contend they are entitled to damages for Avis' breach of fiduciary duty and that they are entitled to an accounting.

■ In answer to questions four, five, and eight, the jury found Avis owed a fiduciary duty to the A & P committee with respect to its handling of expenditures charged to the trust, that Avis breached that duty, and that the A & P committee suffered no damages as a result of that breach. In answer to questions nine and ten, the jury found the breach of fiduciary duty was willful and assessed ten million dollars in exemplary damages. Question twelve, to which the jury answered "no," read "[H]as Avis fully and reasonably accounted to the Advertising and Policy Committee for Avis' management of Advertising funds and assets of the trust prior to January 1, 1981?" Finally, in answer to question 13, the jury found "0" as to the amount of advertising funds and assets of the trust for which Avis failed to account. Appellants argue that the jury's failure to find actual damages, in answer to question eight, is against the great weight of the evidence and is clearly wrong. This assignment of error requires this court to exercise our fact jurisdiction, and in so doing we will apply the traditional test and consider all of the evidence to determine whether the verdict is clearly unjust.

Appellants presented two witnesses, Robert Klein, the comptroller for the trust and an ex-employee of Avis and Ken Miller, an accountant and an independent expert. Through the testimony of those witnesses, appellants sought to prove Avis made secret profits at the expense of the trust in at least five areas: (1) concealed charges for Avis' foreign sales offices; (2) overcharges for international reservations sent from the reservation center to Avis' foreign subsidiaries; (3) overcharges for customer service; (4) overcharges for the northeast regional

sales office, and (5) misappropriation of assets purchased with trust funds.

Concerning charges of the foreign sales offices, appellants contended that, contrary to instructions from the A & P committee to not pay any expenses for the Avis sales offices in Tokyo and Buenos Aires, Avis nevertheless charged the trust for expenses at those offices, "hiding the expenses in the Trust budget as interest expense and improperly inflating the costs attributable to authorized domestic sales offices." In support of that theory, Klein testified that, between 1971 and 1981, "about a million dollars" in unauthorized charges was involved and that, in the year 1977 alone, the unauthorized charges amounted to "approximately 150,000." At another point during trial he testified the amount was $125,000; at deposition he testified the amount was $100,000. In a study Klein conducted in 1986, he put the figure at $90,000; yet at two other times he placed the figure at $80,000 and $27,560. When questioned about the discrepancies, he stated: "If I made a mistake between a hundred and a hundred and fifty, I apologize. I tried to tell what the number was to the best of my recollection. It was an estimate." On cross-examination Klein testified the amount was "approximately" a hundred thousand dollars a year for probably "three or four" years. Miller, on the other hand, did not include any such charges in his compilation of the overcharges because "[he] simply was unable to quantify those amounts to a degree that allowed [him] to feel comfortable enough to include them." However, in another part of his testimony he stated "my best evidence is that was running at the rate of $80,000 a year, and that it occurred for five years. That would be $400,000." Yet at another point in his testimony Miller "approximated" the amount at $8,000 a year.

Concerning the alleged overcharges for international reservations, Klein testified that the reservation center in Tulsa took reservations from U.S. citizens who wanted to travel abroad and that the cost thereof was wrongfully charged to the advertising trust. His "ball park estimate" of the amount wrongfully charged to the trust was "approximately $500,000 a year." Miller, on the other hand, was not able "to determine a rational means by which [he] could determine that amount."

Concerning the allegation of overcharges for customer services, Klein explained that Avis had a customer service department with some forty employees that handled customer complaints. The customer service department was charged to the Advertising Trust. If a complaint received by that department concerned a franchise owner, the complaint was merely put in an envelope and mailed to that licensee to handle. Klein reasoned, therefore, "that the 40 people who were working for customer service, approximately 39 and a half of those people were involved in handling corporate complaints, and one-half of one person was handling licensee complaints only to the extent of putting them into an envelope and mailing them out." In arriving at a conclusion for an overcharge, he testified:

I would say that if a person, half a person was dedicated to the licensees, and if you used the equation that two-thirds or thereabouts of the funds related to corporate funds and one-third to licensee funds, then it would be another portion of a person. So you are talking maybe, tops, two people. And two people's salaries are maybe in the range, at that time, $30,000.

So an overcharge of maybe $145,000. Klein was unable to give a specific time during which the overcharge had been made and on cross-examination he stated that he did not know the amount the advertising trust was entitled to "get back." Miller, on the other hand, did not list this item as an overcharge on his summary, even though he found some assessments that, "in whole or in part, were not justified by the underlying data."

Concerning overcharges for the northeast regional sales office, appellants do not point to, and we have been unable to find, any testimony by Klein bearing on the issue. Miller, however, testified that "this memo indicates that the Ad Trust is being charge [sic] rent for this particular sales

office at the rate of $26 a foot when, in fact, it should be—it should have been charged at the rate of $14.95 a foot." He further stated, however, that the "situation was ultimately corrected" and he could not state whether the overcharge was refunded.

Finally, concerning the allegation that there was a misappropriation by Avis of assets purchased with trust funds, appellants contend that when Avis, in 1981, took control of the reservation center, it misappropriated an asset of the trust. To substantiate this overcharge, appellants reference four exhibits; however, neither Klein nor Miller testified concerning this alleged overcharge and we are unable to discern from the exhibits how appellants were damaged.

It is clear to us that, based on the testimony recited above, the failure of the jury to find actual damages is not against the great weight of the evidence.

As a part of this assignment of error, appellants contend that the findings of the jury that Avis owed a fiduciary duty, that Avis had breached that duty and that Avis had failed to account for the advertising funds and assets of the trust entitled them, as a matter of law, to an accounting. Appellees acknowledge that appellants could have, at the trial court level, "severed the accounting issue, shown their right to an accounting, asked for an auditor and had the accounting dispute resolved in a separate judgment." Appellees point out, however, that appellants chose not to pursue that course of action, but instead they chose to have the jury determine all of their rights, including any amounts of money they should receive from Avis. Appellees contend, therefore, that the jury, having answered all of appellant's issues, "definitely and finally determined the rights of the parties." We agree.

■ In a suit for an accounting, the general rule requires that the right to an accounting must first be determined and, if found, reference for an account should be ordered. *Ferguson v. Ferguson*, 327 S.W.2d 787, 789 (Tex.Civ.App.—Fort Worth

1959), *rev'd on other grounds*, 161 Tex. 184, 338 S.W.2d 945 (1960).

■ Appellants third amended petition, upon which trial was had, contained a prayer that "the Court should require AVIS to render the ADVERTISING AND POLICY COMMITTEE and to the Trustees of the ADVERTISING TRUST a full, true and correct accounting for its collection and expenditure of Advertising Funds of the ADVERTISING TRUST prior to January 1981." Appellants do not contend that they pursued this request and our search of the record fails to reveal any indication that they ever followed up on their request for an accounting. In fact, question 13 was submitted as plaintiffs' (appellants') issue and without objection. We hold that (1) by failing to pursue their request for an accounting, (2) by seeking to prove the amount of the advertising funds and assets of the trust for which they contended Avis had failed to fully and reasonably account for, and (3) by seeking to have the jury decide the accounting issue, appellants abandoned their request for an accounting. *See: Santleben v. Froboese*, 17 Tex.Civ. App. 626, 43 S.W. 571 (1897), writ ref.; *Mamlin v. Fairfield–Noble Corp.*, 433 F.Supp. 317 (N.D.Tex.1977).

■ Appellants further argue that there is an irreconcilable conflict between the jury's answers to questions 12 and 13. We do not agree. An irreconcilable conflict arises only where one of the jury's answers requires judgment for the plaintiff while another answer requires judgment for the defendant. *Little Rock Furniture Mfg. Co. v. Dunn*, 148 Tex. 197, 222 S.W.2d 985, 991 (1941). That is not the situation presented by the jury's answers to questions 12 and 13. Although the jury's answer to question 12 could have given appellants the right to an accounting, appellants abandoned that remedy through the actions delineated above. Therefore, the answers to questions 12 and 13 cannot be said to be in irreconcilable conflict.

■ Finally, under this grouping of points of error, appellants contend the trial court erred in not awarding the exemplary damages found by the jury. The authori-

ties are contrary to their contention and hold that, in the absence of an award of actual damages, punitive damages are improper. *Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 745 (Tex.1986). Appellants' points of error twelve through sixteen are overruled.

■ In their seventeenth and eighteenth points of error appellants contend the trial court erred in concluding that Avis is not restricted to issuing licenses in the form of the 1955–type ELA. The trial court so ruled, as a matter of law, after the close of the evidence. Appellants contend "that the ELA, as a matter of law, *implies* that Avis may not issue any other form of licenses," and argue that the court should have *implied* such a contractual provision. We do not agree for several reasons.

First, the ELA simply does not restrict Avis from issuing other licenses. Second, the jury in response to question 1(c) found that Avis had not agreed to issue only the 1955 ELA form. Third, in answer to question 3(c) the jury also rejected appellants' claims that Avis promised it would not issue a form of ELA other than the 1955 ELA so long as the ELAs are in effect. Fourth, section 8 of the ELA expressly reserves to Avis "the right to change when and as it chooses, the System or any part thereof, including any ... standard Rental Agreements ..." Finally, as we have previously discussed, section 11, the merger clause, prohibits the alteration of the terms of the agreement by surrounding circumstances. Appellants' seventeenth and eighteenth points are overruled.

■ In their two final points of error, appellants contend they are entitled to a declaration that they have a right to use the Avis system. As part of its suit for declaratory judgment, appellants sought a declaration that Avis had no unilateral right to charge the licensees new or increased fees and that the licensees have the right to use the Avis system in return for the performance of their obligations under the ELA.

Appellants correctly point out that, at the conclusion of the evidence, the trial court ruled favorably to them on the first request. The court ruled that Avis had no right to charge or allocate to the licensees any of its costs for activities of the type which were, prior to July 1, 1981, paid for by the committee from the advertising funds in the trust.

After trial, however, appellants submitted a proposed form of judgment, not only including the above provision, but also including a provision that stated the licensees have a right to use the Avis system. In its final judgment, the court did not include a declaration of the licensees' right to use the system. Appellants contend this was error. We do not agree. There never was a dispute over the issue of the licensees' right to use the Avis system and it was not a live controversy. Appellants are seeking an advisory opinion. Judicial power does not embrace the giving of advisory opinions. *Firemen's Ins. Co. v. Burch*, 442 S.W.2d 331, 333 (Tex.1968). Appellants' final two points of error are overruled.

■ In its cross-appeal, Avis brings two points of error. In the first point it contends the trial court erred in disregarding the jury's answers to questions 17 and 18. Those two issues were:

### QUESTION NO. 17

Do you find that the Trustees of the Trust, in expending Advertising Funds on the individual Licensee's causes of action in this litigation, knowingly committed a breach of trust in bad faith? Answer "Yes" or "No" ANSWER: YES

If you have answered Question No. 17 "Yes", then answer the following:

### QUESTION NO. 18

What sum of money represents the total that the Advertising Trust has spent to fund the causes of action in this lawsuit brought by the individual Licensees of the Licensee Class? Answer in dollars and cents. ANSWER: 5 million dollars

When Avis filed it's third amended counterclaim, it added as counter defendants

"the licensee members of the Advertising and Policy Committee of the Avis System (the trustees)" and for cause of action against those trustees, Avis alleged that the trustees had voted to pay, from the funds of the advertising trust, attorney's fees and other expenses incurred by the plaintiffs not only in the present lawsuit but also in the New York action. Avis alleged that, by authorizing such payments from the trust, "VRI, Hayes and the Trustees have misappropriated and converted Ad Trust funds, defrauded the Ad Trust, breached the trust agreement and breached their fiduciary duties." Avis requested that it and the Advertising Trust recover compensatory damages in the amount of not more than seven million dollars reflecting the amount of legal fees and litigation related expenses wrongfully spent by the advertising trust.

The plaintiffs/counter-defendants filed an answer to Avis' third amended counterclaim some twenty-six days later denying liability and specifically answered that the trustees of the trust "cannot be liable for the claims alleged by the Defendants/Counter–Plaintiffs."

The evidence at trial showed that through February 26, 1988, the law firm of Vinson & Elkins, attorneys for plaintiffs/cross-defendants (appellants and cross-appellees) had been paid some $7,750,000 for fees and reimbursement of expenses out of the advertising trust account. Avis alleged that a portion of that sum was used to fund the licensees' causes of action. By funding the licensees' lawsuit, Avis alleged the trustees acted in bad faith.

Following return of a favorable verdict for Avis, Avis filed a motion for judgment and plaintiffs in the trial court filed a motion to disregard the jury's answers to questions 17 and 18 because the trustees were not parties to the suit. The trial court disregarded the answers in entering judgment.

Avis contends the trial court erred in so doing because "pursuant to TEX.R.CIV.P. 121 the licensee-trustees' answer constituted a general appearance, dispensing with the necessity for the issuance of service of citation." We agree. When the trustees filed their answer denying liability and invoked that part of the trust agreement providing that a trustee shall have personal liability only for acts "knowingly committed in bad faith," they joined issue and were before the court.[2]

Avis also points out that the record shows that, during trial, the trustees admitted they were parties. Prior to the start of testimony when the issue of what witnesses would be subject to the rule arose the trial judge stated he would allow a representative of the corporation, which was a party to the lawsuit, and a representative of all of the parties to the lawsuit to remain in the courtroom. When Avis objected to having all licensees present in the courtroom, the judge required the licensees to name a representative, which they did. The following morning the plaintiffs in the trial court (cross-appellees) filed their "Plaintiff's Memorandum of Law in Support of Parties' and Expert Witnesses' Attendance at Trial." In that memorandum, appellants sought to exempt the trustees from the rule excluding witnesses from the courtroom. To do so, appellants averred that the "named Plaintiffs are the Advertising and Policy Committee of the Avis Rent A Car System, a joint committee comprised of Licensee and Avis corporate representatives, and the Avis System Advertising Trust[.]" The memorandum further stated, "The Defendants have asserted counterclaims against the Licensees who serve as Trustees of the Avis System Advertising Trust, among others, *thus making them parties for this purpose.*" (emphasis supplied)

The parties dispute whether this amounts to a judicial admission and we need not determine that issue. It unquestionably shows, however, that the plaintiffs

---

**2.** As pointed out by Avis, "the terms of the Avis System Advertising Trust," involved in paragraph XV of the answer to the Third Amended Counterclaim, which sought recovery from the trustees "apply only to the liability of the individual trustees for acts committed in bad faith."

recognized the individual trustees were parties to the lawsuit.

Finally, it is pointed out that there was no objection to questions 17 and 18 on the basis that the trustees were not parties to the lawsuit. Thus, cross-appellees are in no position to now contend they were not parties and we, accordingly, sustain Avis' first cross-point.

In their second cross-point Avis contends the trial court abused its discretion in awarding attorney's fees to the plaintiffs in the amount of $5,250,000.

■ In answer to question 11, the jury found the reasonable and necessary attorney's fees for the time expended "for breach of contract, declaratory relief, and those other claims that are so interrelated and inseparable" therefrom to be $5,250,-000. Plaintiffs (cross-appellees) brought only two causes of action under which they could recover attorney's fees. The first was for breach of contract. Avis contends that because the jury found no breach of contract by Avis, the plaintiffs (cross-appellees) were not entitled to attorney's fees under section 38.001, TEX.CIV.PRAC. & REM.CODE ANN. We agree. To be entitled to attorney's fees as authorized by section 38.001 for a claim under a contract, a party must bring a valid claim, *i.e.* there must be a recovery. *See: Perritt Company v. Mitchell,* 663 S.W.2d 696, 699 (Tex. App.—Fort Worth 1983, writ ref'd n.r.e.); *Village Medical Center, Ltd. v. Apolzon,* 619 S.W.2d 188 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ).

■ Second, the only other basis on which plaintiffs (cross-appellees) could have recovered attorney's fees was under the declaratory judgment statute, TEX.CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1986). Avis contends, however, that awarding plaintiffs (cross-appellees) $5,250,000, which was only $3,000 short of all of the attorney's fees they expended in the entire case amounted to an abuse of discretion. Again, we agree. Plaintiffs' (cross-appellees') petition contained some twelve counts, only two of which sought declaratory relief. They lost on the ten counts which did not request declaratory relief and lost all ten requests for declaratory relief except: (1) the declaratory relief granted on summary judgment in cause number B14–88–00413–CV which we have this day reversed and rendered in favor of Avis and, (2) three incidental matters: *i.e.* that the inner city rules and regulations of the Avis System shall not be changed without a prior written agreement between Avis and the licensees representatives; that Avis did not have the unilateral right to assess the licensees for any of its costs for the sales force, reservations center and other matters, and that Avis did not have the right to terminate the ELA except under certain circumstances. Avis contends those matters were uncontested, while appellees argue they were highly contested. Our review of the record convinces us that those requests for declaratory relief were, in fact, incidental and were effectively non-issues.

Where a trial court denies declaratory relief or improperly renders a declaratory judgment, it is an abuse of discretion to award attorney's fees to the party that is not entitled to any relief. *City of Houston v. Harris County Outdoor Advertising Association,* 732 S.W.2d 42, 56 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). We find the trial court abused his discretion in awarding attorney's fees. Avis' second cross-point of error is sustained.

Cross-appellees, through two separate law firms, have filed cross-points of error to Avis' cross-appeal. They contend that, should we sustain Avis' first point of error in its cross appeal (that the trial court erred in disregarding the jury's answer to questions 17 and 18), there is either no evidence or insufficient evidence to support the jury findings to each issue and, finally, that the answers of the jury to questions 11(a) and 17 and 18 create an irreconcilable conflict.

■ In answer to question 17, the jury found the trustees of the Advertising Trust committed a breach of trust in bad faith. A basic duty owed by a trustee to a trust is to preserve the trust property. *Tucker v. Dougherty Roofing Co.,* 137 S.W.2d 884,

887 (Tex.Civ.App.—Dallas 1940, writ dism'd judm. cor.) By funding the licensees' lawsuit, Avis contends the trustees of the Advertising Trust breached that duty.

The trust agreement provides, "The Trustees individually or collectively shall not be personally liable for any act or failure to act of said Trustees or their agents, except for their own willful acts, neglects and defaults constituting a breach of trust knowingly committed in bad faith." Therefore, the only causes of action attributable to the A & P committee and the trustees are those concerning the expenditure of trust funds, and the accounting issue. The other issues involved disputes over the construction of the ELA between Avis and the *licensees.* The trust agreement provides that the trust fund is under the control of the trustees as directed by the A & P Committee. The licensees only have control over those funds through their representatives on the A & P Committee. Thus, to spend trust funds on causes of action pertaining only to the licensees and not the trustees or the committee is a breach of the trustees' duty to protect the assets of the trust. We find the evidence sufficient to support the jury's finding that the trustees committed a breach of trust in bad faith.

The jury allocated $5,000,000 of the $7,750,000 in legal fees to the causes of action that belonged to the licensees alone. Based on the testimony the $5,000,000 reasonably reflects the relationship between the total fees of $7,750,000 and the fees spent on those issues that pertained to the licensees alone. Therefore, the evidence was sufficient to support the jury's answer to question 18.

■ Finally, we reject cross-appellees contention that there is an irreconcilable conflict between the answers of the jury to questions 11(a) and 17 and 18. In answer to question 11(a), the jury found that the reasonable and necessary attorney's fees which Vinson & Elkins was entitled to receive for the work performed was $5,250,-000. Question 17 only asked if the trustees of the trust knowingly committed a breach of trust in bad faith "in expending Advertising Funds on the individual Licensee's causes of action in this litigation." And in answer to question 18, the jury found that the advertising trust has spent $5,000,000 "to fund *the causes of action in this lawsuit brought by the individual Licensees* of the Licensee Class." (emphasis supplied) There was no objection to the issue as worded. We do not discern a conflict. While the jury found that $5,250,000 was the total amount of attorney's fees Vinson & Elkins was entitled to receive, the jury also found $5,000,000 of that amount was improperly disbursed from trust funds because it went to fund the licensees' causes of action. The jury apparently believed the trust should bear some of the expenses. Cross-appellee's cross-points are overruled.

The judgment of the trial court is affirmed, except as to that portion awarding attorney's fees. As to the award of attorney's fees, that portion of the judgment is modified to reflect that appellants (plaintiffs in the trial court) take nothing. Further, the judgment is modified to reflect that the individual trustees—J. Dan Baker, John R. Burch, Gene M. Ehlers, Robert T. Hayes, Orval W. Story, Jay N. Weinberg and C. Kenneth Wright, jointly and severally, shall pay the Avis System Trust the sum of $5,000,000 plus interest at a rate of ten percent per annum from the date of the rendition of the trial court's judgment.